UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CECIL BRACE, Administrator       )
of the Estate of Cynthia Brace,  )
        Plaintiff                )
                                 )
              v.                 )    C.A. No. 08-cv-30184-MAP
                                 )
COMMONWEALTH OF MASSACHUSETTS    )
STEVEN GOBIELLE, R.N.,           )
JENNIFER KANE, R.N.,             )
Defendants                       )


MEMORANDUM REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 58)

January 3, 2012

PONSOR, U.S.D.J.

## I.  INTRODUCTION

Cecil Brace brings this litigation pursuant to 42 U.S.C. § 1983, alleging that the Commonwealth of Massachusetts, through the Hampden County Correctional Center (the "HCCC") and its medical staff, exhibited deliberate indifference to his wife's medical needs while she was withdrawing from drug and alcohol addiction as a prisoner in the HCCC's custody, ultimately causing her death.  The complaint as originally filed also included state law tort claims for negligence against the

Commonwealth of Massachusetts and several of its employees.

During the preliminary stages of this case a number of counts, involving Defendants Linda Goodman, Jennifer Belle-Isle and Rebecca Frey were voluntarily dismissed. Defendants thereafter filed a motion for summary judgment on all the remaining claims, including those against Defendant Commonwealth of Massachusetts and against two individual Defendants, both employees of HCCC, Steven Gobielle and Jennifer Kane (Dkt.No. 58). On September 8, 2011, counsel presented their arguments on the motion, and on November 8, 2011, the court issued a short order allowing Defendants' motion as to Counts III, V, and IX (the federal civil rights claims) and Counts IV and VIII (the negligence claims against Defendants Gobielle and Kane), but denying the motion as to Counts I and II (the negligence claims against the Commonwealth purportedly based on vicarious and direct liability). The brevis memorandum was issued in order to provide guidance to counsel in preparing for the imminent trial, which had been scheduled to get under way on December 5, 2011, with the promise that a more detailed memorandum, explaining the court's rationale for its rulings, would

follow.  This is the promised memo.[1]

## II.  <u>FACTS</u>

The facts are viewed, as required by Fed. R. Civ. P. 56, in the light most favorable to the non-moving party, here Plaintiff.

Cynthia Brace, Plaintiff's decedent, was arrested by officers of the Holyoke, Massachusetts police department on August 18, 2005.  She was transported the next day to the state district court in Holyoke and was ordered remanded to the HCCC.  She arrived there around 5:30 p.m. on August 19, 2005. (Dkt. No. 62, Ex. 10, at 5.)

At 8:30 p.m., Brace was processed at the HCCC through an Intake Admission Screen.  Rita Johnson, a medical support staff person, conducted the screening and noted that Brace was oriented to time and place, and that she was neither combative nor lethargic.  According to Johnson, who was not a medical professional, Brace's vital signs were normal. (<u>Id.</u>)

---

[1]As it turned out, the trial did not go forward due to the unavailability of Plaintiff's co-counsel.  One purpose of this memo will be to get the case back on track for disposition.

At around 9:30 p.m., Defendant Jennifer Kane -- a registered nurse -- conducted a medical screening. Brace suffered from many ailments and was on a large number of prescription drugs. While she was able to tell Kane that she abused alcohol, and suffered from ulcers, migraines, a fractured patella, bipolar disorder, and panic attacks (Dkt. No. 62, Ex. 10 at 4), she was unable to remember what medications she took for her knee pain and mental health issues. At the time, Brace's pharmacy was apparently closed. Therefore, Kane noted that she was unable to verify Brace's medications and "referred [Brace] to clinic for am f/u [follow-up]." (Dkt. No. 62, Ex. 10, at 6.)

In addition to her health problems, Brace also told Kane that she had made a prior suicide attempt and that she had the potential for self-harm while in jail, "if I don't get my meds." (Dkt. No. 62, Ex. 10, at 13.) Kane therefore placed Brace in segregation, with a paper gown and a suicide-proof blanket, and scheduled regular checks every fifteen minutes. She also ordered Librium and Vitamin B to assist with any symptoms of alcohol withdrawal. (Dkt. No. 62, Ex. 10, at 6). Kane administered the first dose of

Librium and Vitamin B and then sent Brace to her segregated cell. (Id.)

Brace arrived at her cell around 10:15 p.m. The correctional officer ("CO") in charge of checking on Brace, Adriana Spagnoli, noted that she was lying in bed. Occasionally, she would speak to herself and swear. (Dkt. No 62, Ex. 10, at 34.) At around 2:45 a.m. she fell asleep, waking up at around 4:15 a.m. (Id.)

At this point, Spagnoli noted that Brace "had [an] accident," presumably incontinence, and wanted a shower.(Dkt. No. 62, Ex. 10, at 35.) A special operations team from the jail escorted her to a shower, and she returned fifteen minutes later without incident.

Sometime later Brace started vomiting. Spagnoli noted that Brace vomited at 6:40 a.m. and again fifteen minutes later. An entry from 7:10 a.m. to 7:45 a.m. notes that Brace was "in-bed breathing." (Id.) At 7:45, presumably concerned about Brace, Spagnoli called the medical office. She spoke with a man at the office and requested that a nurse named "Jodi" come to Brace's cell to examine her. (Id.) In a subsequent incident report, Spagnoli said she

told the man whom she spoke to that Brace was detoxing and needed to be seen right away. According to Spagnoli, the man replied that he would have "Jodi" call Spagnoli or send him to Brace's cell. (Id.) Whatever the significance of the reference to "Jodi," it appears undisputed that Defendant Stephen Gobielle, R.N., was the only person in the medical unit at the time Spagnoli called.

The supposed communication from Spagnoli to the medical unit presents a point of dispute. Gobielle denies receiving Spagnoli's call. (Dkt. No. 62, Ex. 6, Gobielle Dep. 65:5-13.) In the incident report she prepared later, Spagnoli says that she dialed extension 2773. (Dkt. No. 62, Ex. 10, at 133.) According to HCCC officials and Gobielle, the extension for the medical department is 2337; 2773 is the extension for another cell block. (Dkt. No. 62, Ex. 6, Gobielle Dep. 65:5-13.)

Brace later complained about stomach problems to CO Michael Gianni, the officer who came on duty after Spagnoli. Gianni noted that the medical office had not yet responded to Spagnoli's earlier phone call. According to the record, Gianni decided to call the medical office himself if he did

not hear back from the medical department within the half-hour following his receipt of Brace's complaint of stomach problems. (Dkt. No. 62, Ex. 12, at MSP 175.)

At 8:42 a.m. Gianni called the medical department, and it is undisputed that at this time he spoke with Gobielle. In his subsequent incident report, Gianni said that Gobielle told him that Brace was heavily detoxing and that he (Gobielle) would re-evaluate her for possible dehydration in two hours. (Dkt. No. 62, Ex. 10.)  Gobielle told Massachusetts State Trooper Brendan O'Toole in a later statement that he had instructed Gianni "that the inmate should not eat or drink for approximately two hours to rest her GI tract to see if it helped.... at the end of the two hour period if [Brace] was still having the nausea and vomiting [Gianni should call Gobielle]." (Dkt. No. 62, Ex. 10, Gobielle Dep. 84:17-22).  Two hours from the time Gianni called would be fifteen minutes before Gobielle completed his shift. (Dkt. No. 64, Pl. Opp'n at 7.)

About forty-five minutes (not two hours) later, at 9:30 a.m., Rebecca Frey, a forensic mental health clinician -- responding to a referral form from the medical department --

checked on Brace in her cell and determined that she required further evaluation. According to Frey's report, Brace "was in significant medical distress" by this time, and her cell was "littered [with] urine, feces, and vomit." (Dkt. No. 62, Ex. 2, at 8.) While Brace's speech was broken by heavy breathing, she was nonetheless ambulatory enough to walk again to the shower. (Id.)

Having seen Brace's state, Frey called Defendant Gobielle to alert him and to request that he come to Brace's cell. Defendant Gobielle then decided to have Brace brought to his office in the medical department. (Dkt. No. 62, Ex. 6, Gobielle Dep. 94:13-15.) He requested that Brace be given a shower prior to being transported, in order to ensure that she would not be soiled with body fluids when she arrived. (Id. at 86:19-24.)

CO Reinaldo Ortiz took Brace to the medical department in a wheelchair. In his later incident report Ortiz wrote that Gobielle told him that he was going to try "to possibly get some fluids in" Brace, because otherwise she would have to go to the hospital. (Dkt. No. 62, Ex. 12, at MSP 187.) According to Ortiz, Brace was coherent and did not seem to

have difficulty breathing. (Id.)

When Brace arrived at the medical department, Defendant Gobielle examined her. In his report Gobielle stated that he asked Brace how she was doing, and that in response Brace "was looking at me and communicating to me her needs." (Id.) Brace told him that she drank one pint of alcohol each day and that she wanted medication for the pain in her leg. (Id.) Hearing this, Gobielle told Brace that "the more urgent need was to control her nausea and vomiting so that we could stabilize that condition prior to administering any medication for pain orally." (Id. at 96:17-21.)  He then called Brace's pharmacy, which confirmed that Brace had prescriptions for Elavil, Oxycontin, Percocet, Soma, Propoxyphene, Protonix, and Klonopin. (Dkt. No. 62, Ex. 10, at 58.)

At 10:19 a.m. Gobielle wrote that Brace was "alert," and that she told him, "I need something for pain."  He noted that her skin was "pink, warm, and dry" and that she was suffering from diarrhea and vomiting and was unable to keep down the Librium. (Dkt. No. 62, Ex. 10, at 58.) Gobielle testified that he was aware of the possibility of

dehydration but found no signs that Brace was dehydrated during his examination. (Dkt. No. 62, Ex. 6, Gobielle Dep. 127:19-24.)  For example, her blood pressure was normal, and her mucus membranes were moist. (Id. at 130:2-131:6.)  Based on this examination, Gobielle "made the determination that her condition was stable from a cardiovascular standpoint," and that she could be managed at the medical department rather than at the hospital. (Id. At 134:7-10.)

Once he decided that Brace's vital signs were stable, Defendant Gobielle contacted Nurse Practitioner Linda Goodman. He believed that Brace would benefit from a Phenergan suppository for her nausea and vomiting. (Id. at 98:13-15.) Gobielle testified that HCCC did have an injectable form of Benadryl, which also could be used to treat nausea, but he did not think to use Benadryl at the time. (Id. at 99:2-4.)

Brace administered the Phenergan suppository herself at 10:20 a.m., but she reported soon after that "she was thinking that the suppository had come out." (Id. at 100:1-2.)  In his deposition, Gobielle repeated that he thought there was a possibility that the suppository had fallen out,

but that he wanted to wait for about twenty minutes to see if the Phenergan had taken effect. (Id. at 110:12-111:4.) At 10:45 a.m. Gobielle orally administered Imodium for Brace's diarrhea and Compazine for her nausea. Gobielle wrote in his report that at 10:47 a.m. Brace asked him, "If I can keep meds down[,] what are you gonna give me for pain?" (Dkt. No. 62, Ex. 10, at 59.)

After administering the Imodium and Compazine, Gobielle placed Brace on a stretcher in a hallway, about twenty feet from where he sat in the nurses's station. The stretcher was separated from the hallway by a plate of glass, making it somewhat difficult for anyone sitting at the nurses's station to see Brace. (Id. at 39:5-7, 114:21-24.) According to Gobielle, he put Brace in the hallway so she would be close by for him to monitor. (Id. at 123:23-24.) HCCC nurse Julie Belle-Isle confirmed that patients who required frequent monitoring were placed on a hallway stretcher. (Dkt. No. 66, Ex. A, Belle-Isle Dep. 74:16-24.) At the time, Gobielle said his other options would have been to return Brace to her cell or to keep her down the hall in an examination room where he would be unable to see or hear

her. (Dkt. No. 62, Ex. 6, Gobielle Dep. 124:1-5.)  Brace

vomited the medication she had been given by Gobielle at

10:55 a.m., about ten minutes after taking it. (Id. at

102:19-21.)

At 11:20 a.m., Physician's Assistant Edward Pacitti

told Defendant Gobielle that Brace "doesn't look good."

(Dkt. No. 62, Ex. 10, at 59.)  Gobielle wrote later that he

then immediately went to assess Brace's condition.  He found

her unresponsive to "shake-and-shout," and without

respiration or a pulse. (Id.)  She was taken by ambulance to

Baystate Medical Center, where she was pronounced dead at

12:17 p.m. (Dkt. No. 62, Ex. 10.)

The following day, on August 21st, an autopsy was

performed on Brace, which listed the cause of death as

cardiac arrhythmia, myocardial fibrosis, and coronary

atherosclerosis.  The report listed her cause of death as

"natural." (Dkt. No. 62, Ex. 4.)

### III.    DISCUSSION

A.    The Summary Judgment Standard.

Summary judgment is appropriate if there is no genuine

issue of material fact and the moving party is entitled to

judgment as a matter of law.  Feeney v. Corr. Med. Servs.
Inc., 464 F.3d 158, 161 (1st Cir. 2006).  Although a "state-
of-mind issue such as the existence of deliberate
indifference usually presents a jury question," Torraco v.
Maloney, 923 F.3d 231, 234 (1st Cir. 1991), "a party against
whom summary judgment is sought is [not] entitled to a trial
simply because he has asserted a cause of action to which
state of mind is a material element."  Hahn v. Sargent, 523
F.2d 461, 468 (1st Cir. 1975).  The non-moving party must
present competent evidence that shows a genuine issue for
trial.  Ruiz-Rosa v. Rullán, 485 F.3d 150, 156 (1st Cir.
2007).

B.    The 42 U.S.C. § 1983 Claims.

      A showing of "deliberate indifference" on the part of
correctional employees to a pre-trial inmate's medical needs
may form the basis of a federal civil rights claim under the
Fourteenth Amendment.  Estelle v. Gamble, 429 U.S. 97, 104
(1976).  "Deliberate indifference" has both a subjective and
an objective element.  A plaintiff must first show that the
defendant, in fact, "knew that a substantial risk existed
and was actually indifferent to it in failing to take

13

appropriate mitigating action." <u>Ramos v. Patnaude</u>, 640 F.3d 485, 489 (1st Cir. 2011). Second, a plaintiff must prove that the deprivation of care was "objectively, sufficiently serious." <u>Leavitt v. Corr. Med. Servs. Inc.</u>, 645 F.3d 484, 497 (1st Cir. 2011) <u>citing</u> <u>Burell v. Hampshire Cnty.</u>, 307 F.3d 1, 8 (1st Cir. 2002).

Plaintiff alleges that the HCCC was itself deliberately indifferent to his wife's care. He claims that the HCCC had inadequate intake procedures, did not train its staff to monitor for signs of drug or alcohol withdrawal, did not adequately screen inmates for withdrawal, and did not direct its correctional officers to call the medical department immediately when an inmate began to show signs of withdrawal. Defendant HCCC argues that no significant inadequacies existed in its policies or practices related to medical care of inmates -- certainly none that would rise to the high level of "deliberate indifference" as construed by the courts. Moreover, the HCCC points out that, even assuming general inadequacies and shortcomings (which it denies), these played no causal role in any specific constitutional violation suffered by Cynthia Brace, since

none of the HCCC's employees exhibited the required

"deliberate indifference" to Brace's medical condition.

Plaintiff also alleges that two of the HCCC's medical

professionals -- Defendants Stephen Gobielle and Jennifer

Kane -- were, as individuals, deliberately indifferent to

Brace's condition.  He says that Kane should have taken a

comprehensive history of Brace that would have alerted her

to the need to begin a treatment protocol, and that she

should have alerted correctional personnel to Brace's

condition.  He also alleges that Gobielle deliberately

avoided a telephone call from the correctional staff

alerting him to the deterioration of Brace's condition, and

that Gobielle exhibited deliberate indifference by not

providing appropriate medical care once he noticed that

Brace was very sick.

As noted above, in order to succeed on either of these

claims, Plaintiff must show that Defendants were "'aware of

facts from which the inference could be drawn that a

substantial risk of serious harm exist[ed],' that each

defendant did, in fact, 'draw the inference,'" and that the

Defendants' failure to provide medical care thereafter

amounted to "deliberate indifference" to Brace's medical needs.  <u>Leavitt</u>, 645 F.3d at 502 (internal citations omitted) (emphasis in the original).  The record, viewed in the light most favorable to Plaintiff, simply will not support any such conclusions.

    1.   <u>Stephen Gobielle</u>.

Defendant Stephen Gobielle, Plaintiff says, exhibited deliberate indifference when he ignored CO Spagnoli's 7:45 a.m. phone call telling him that Brace was vomiting and in withdrawal.  He again demonstrated actionable indifference, Plaintiff argues, when CO Gianni followed up with another phone call at 8:45 a.m., and Defendant Gobielle told him to wait for two hours.  Finally, Plaintiff contends, Defendant Gobielle exhibited additional deliberate indifference when he gave an "inaccurate" and "incomplete history" to Nurse Practitioner Goodman when he consulted her about proper medications. (Dkt No. 64, Pl. Opp'n. at 20).

Defendant Gobielle disputes that he received the 7:45 a.m. call, saying that CO Spagnoli's incident report shows that she called the wrong number.  However, construing the facts in the light most favorable to Plaintiff, there is a

slim but sufficient basis in the record to permit a jury to conclude that Gobielle did in fact receive the call. A reasonable juror could find that CO Spagnoli made the call, that she told Gobielle about Brace's condition, and that Spagnoli simply transposed the numbers she called department when she wrote her incident report. For purposes of this discussion, the court will assume a jury could find that Gobielle received Spagnoli's call.

Plaintiff must show, however, that in response Defendant Gobielle provided care "so inadequate that it shocks the conscience," <u>Sires v. Berman</u>, 834 F.2d 9, 13 (1st Cir. 1987), and further that he actually "knew of and disregard[ed] an excessive risk to [Brace's] health and safety." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). The record offers no evidence that he was aware of an excessive risk, or that, in response, he provided care so inadequate that it shocked the conscience.

Plaintiff argues that Gobielle should have seen Brace instantly when she started vomiting. This is in itself a doubtful argument; people vomit for many reasons. Even accepting the argument, however, in a federal civil rights

claim the issue is not what the optimal course of treatment might have been.  Rather, the analysis must focus on whether the healthcare provided, or not provided, created an excessive risk, even if the care may be deemed negligent under tort law.

As the First Circuit has emphasized, "[w]hether or not a jury would be warranted in finding this course of treatment substandard, even to the point of malpractice, is not the issue.... [T]he only permissible basis for liability is deliberate indifference on the part of the defendant." Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir. 1981). Plaintiff does not point to any evidence that Defendant Gobielle subjectively realized the seriousness of Brace's condition, or that his response to Brace's maladies was sufficiently egregious to support a federal constitutional claim.  The reports of Plaintiff's two experts that Gobielle's actions breached standard medical protocols (Dkt No. 66, Exs. A, B & C), while perhaps significant on the negligence counts, are insufficient to boost his claim to a constitutional level.

It is true, of course, that Defendant Gobielle could

have sent Cynthia Brace to a hospital immediately, and in
retrospect, perhaps, it is quite regrettable that he did not
do this.[2]  The selection of one approach to treatment rather
than another, however, provides little in itself to support
a claim of deliberate indifference in general and offers no
help to Plaintiff here.  All medical staff must make
judgments that sometimes reveal themselves later as
mistaken.

The record makes clear that while Gobielle's response
may be criticized in hindsight, he did affirmatively take a
number of significant actions based on what he was told.
Under these circumstances, while he may have been negligent,
he was not "indifferent" for Eighth Amendment purposes.  The
First Circuit has recognized that neither "insufficient zeal
for efficiency" nor "misjudgment, even negligent
misjudgment" is equivalent to deliberate indifference.
Ramos v. Patnaude, 640 F.3d 485, 491 (1st Cir. 2011)
(Souter, J.).  Indeed, in Ramos the court recognized that

_____

[2]Defendants take the position that Brace's death, while
tragic, resulted from her cardiac condition, not drug or
alcohol withdrawal, and was inevitable whatever HCCC staff
had done, even if she had been hospitalized.

drug withdrawal may involve a high degree of squalor and distress on the part of an addict and that a measured response, such as was taken here, will not constitute deliberate indifference.  As the court noted, "any detoxification of a substantial drug user will involve vomiting and diarrhea."  Id., at 491.

Finally, Plaintiff suggests that if Defendant Gobielle had told Nurse Practitioner Goodman how long Cynthia Brace had been exhibiting symptoms -- rather than incorrectly telling Goodman that Brace had only vomited once (Dkt. No. 62, Ex.6, at 82) -- then Goodman would have recommended a different and more effective course of treatment.  However, Nurse Goodman's own deposition testimony indicates that she only wanted Defendant Gobielle to check "to see if the patient is alert, oriented to person, place or time, checking for neurological symptoms . . . pins and needles . . . any signs of delirium, also hallucinations, changes in bowel/bladder function . . . any severe symptoms where the patient becomes incoherent, possible seizure activity." (Dkt. No. 62, Ex. 8 at 39.)  No evidence exists that Cynthia Brace was ever suffering from any of these symptoms.  Given

the absence of these indications, it is pure speculation to suggest that Goodman would have responded differently if she had been told that Brace vomited more than once. Moreover, the omission amounted, at most, to negligence and not deliberate indifference.

For all these reasons, Defendants's Motion for Summary Judgment as to Count V, the civil rights claim against Gobielle, was allowed in the court's November 8, 2011 memo.

2. <u>Jennifer Kane</u>.

Plaintiff contends that Jennifer Kane failed to take a comprehensive health history during Cynthia Brace's intake screening, and that, if she had, she would have known to contact Nurse Practitioner Goodman to create a proper treatment protocol that might have saved Brace's life. Furthermore, Plaintiff argues that Defendant Kane sent Brace to a cell with no medical supervision and without instructing the correctional officers on duty to contact the medical unit if Brace became ill.

Again, despite these arguable omissions, the record is clear that Defendant Kane was far from "deliberately indifferent." She asked about Brace's alcohol abuse and put

her on the HCCC alcohol withdrawal protocol, which included prescribing particular medications that she was authorized to order.  This affirmative treatment effort is inconsistent with any claim of indifference.  Again, while Kane might have done more, the claim against her for a <u>constitutional</u> violation lacks support.

The charge that Kane failed to instruct the correctional officers to call her if Brace had health problems has no traction.  The officers, in any event, did call the medical unit as soon as they realized that Brace was in distress.  Far from being deliberately indifferent, Defendant Kane conducted a health screening that revealed an alcohol abuse problem and made arrangements to treat it, and the officers promptly notified the medical unit when Brace's condition deteriorated.

Under these circumstances, no reasonable jury could find Defendant Kane's conduct rose to the level of a constitutional violation and thus Defendants' Motion for Summary Judgment as to Count IX, the civil rights claim against Kane, was allowed in the court's prior memo.

3. <u>Commonwealth of Massachusetts</u>

Since the actions of the HCCC employees fell well below the required constitutional standard of deliberate indifference, the Commonwealth of Massachusetts, which is responsible for the HCCC, cannot be liable for any Eighth Amendment violation. The HCCC's failures in training, supervision, procedures, or protocols (if any) simply could not have played a role in any constitutional violation, since the record is insufficient to support a finding of any such violation.[3] For this reason, the court allowed Defendants' motion for summary judgment as to Count III, the civil rights claim against the Commonwealth.

C. **Negligence Claims**.

    1. **Gobielle and Kane**.

---

[3]A serious question exists as to whether the Commonwealth would, in any event, enjoy immunity from suit in this federal court under the Eleventh Amendment. See Caisse v. DuBois, 346 F.3d 213, 218 (1st Cir. 2003); Rivera v. Commonwealth of Mass., 16 F. Supp. 2d 84, 87 (D. Mass. 1998). However, this defense has not been raised, and "unless the State raises the matter, a court can ignore it." Wisconsin Dept. Of Corrections v. Schacht, 524 U.S. 381, 389 (1998). It also appears clear that the Commonwealth is not a "person" for purposes of 42 U.S.C. § 1983, and therefore may not be sued, even in state court, under this statute. Will v. Michigan Department of State Police, 491 U.S. 58 (1989); Wilson v. Brown, 889 F.2d 1195 (1st Cir. 1989).

Under the Massachusetts Tort Claims Act ("MTCA"), public employees are immune from personal liability for negligence to the extent they were acting in their capacities as public employees. Mass. Gen. Laws. ch. 258, § 2. All parties agree that this immunity applies to Gobielle and Kane and concur that summary judgment should be granted. Therefore, Defendants' Motion for Summary Judgment was be allowed as to Counts IV and VIII, the claims asserting individual liability for negligence against Gobielle and Kane.

2. <u>Commonwealth's Vicarious Liability</u>.

The MTCA does allow claims against the Commonwealth for the negligence of its employees. Mass. Gen. Laws ch. 258, §§ 2, 3.

In seeking summary judgment on this claim, Defendants contend that Brace died simply from undiagnosed coronary artery disease and that the record will support no other conclusion. (Dkt. No. 62, Ex. 5.) Any negligence on the part of the Commonwealth's employees, Defendants argue, therefore bore no causal relation to any injury to Brace.

Significantly, however, Gobielle said that he saw no

signs of a heart attack, saying "I do not believe I identified any reason that she would be at increased risk of cardiac arrest." (Dkt. No. 62, Ex. 6 at 23.)  Moreover, while one of Plaintiff's experts agrees that Brace suffered from "severe heart disease," she says that it was Brace's "untreated opiate/ethanol" withdrawal that was the proximate cause of her death since it placed "significant stress on the heart, causing it to beat faster and stronger." (Id.)

Thus, on the negligence count, the issue of proximate cause presents a classic "battle of the experts."  Given that the "the fact-finder is of course free to find some experts more credible than others," Lama v. Borras, 16 F.3d 473, 478, (1st Cir. 1994), Defendants' argument in favor of summary judgment fails, and the Motion for Summary Judgment as to Count I, on that rationale, must be denied.[4]

3.  Commonwealth's Direct Liability.

Lastly, Plaintiff claims that the Commonwealth is directly liable for Brace's death by virtue of a series of negligent actions surrounding its general provision of

_____

[4] See n.3, supra, regarding a possible Eleventh Amendment defense that has not been raised.

healthcare to inmates suffering from withdrawal. In
response, Defendant argues that its actions fall under the
discretionary function exception to the MTCA. Mass. Gen.
Laws ch. 258, § 10(b).

To examine whether discretionary function immunity
exists, a court follows a two-part test. Harry Stoller &
Co. v. Lowell, 587 N.E. 2d 780, 782 (Mass. 1992). First,
the court must determine whether the government actor had
discretion. If so, the court must analyze the second factor:
whether the exercise of discretion involved "policymaking or
planning." Id. at 783.

Here, Defendant argues persuasively that the
Commonwealth, through the HCCC, had some degree of
discretion in developing policies for medical treatment of
inmates. The facts of record satisfy this first element of
the discretionary function analysis. In the circumstances of
this case, however, it cannot be said that the Defendant has
adequately satisfied the second criterion. The decision-
making here cannot fairly be said to represent "planning and
policymaking." Whitney v. Worcester, 373 Mass. 208, 217
(Mass. 1977).

The discretionary function exception is aimed at preventing "judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through medium of action in tort." Crete v. City of Lowell, 418 F.3d 54, 63 (1st Cir. 2005) (quoting United States v. Varig Airlines, 467 U.S. 797, 814 (1984)). The protocols for providing medical care in specific situations at the HCCC bear little resemblance to public policy formulations designed to implement state policy goals. Indeed, the HCCC's guidelines are more akin to a list of rules at any hospital or medical office across the country. Litigation regarding the adequacy of the HCCC's general medical procedures and practices in responding to inmate needs creates no danger of second-guessing legislative decision-making.

Because the Commonwealth's arguments in favor of qualified immunity lack sufficient force, at least at this stage of the litigation, Defendants' Motion for Summary Judgment as to Count II was denied in the court's November

8, 2011 memorandum.[5]

## IV. CONCLUSION

For the foregoing reasons, in its November 8, 2011
order, the court DENIED Defendants' Motion for Summary
Judgment (Dkt. 58) as to Counts I and II and ALLOWED it as
to Counts III, IV, V, VIII, and IX.

As noted above, at n. 1, the trial originally scheduled
for this case was postponed due to the unavailability of
Plaintiff's counsel and the possibility that new counsel
would need to be retained.  If the case is to be tried
before this court, in light of the fact that counsel
estimate that two weeks will be needed for evidence, then
(in light of the age of this case) the trial must commence
by the end of February, 2012.  Alternatively, and
particularly in light of possible Eleventh Amendment issues,
counsel may move to remand the two remaining state law
claims to state court.  Counsel are hereby ordered to submit
a joint status report, on or before January 9, 2012, setting

---

[5]As the court has noted, supra n. 3, a question of the
Commonwealth's Eleventh Amendment immunity from suit in
federal court may lie buried in this litigation.  The issue,
however, has not been raised, and the court will not raise
it sua sponte.

a trial date for some Monday on or before February 27, 2012.

Alternatively, counsel may file a motion to remand Counts I

and II to state court for trial.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U.S. District Judge